860 So.2d 119 (2003)
Leo MISEWICZ
v.
Dorene G. GAMSO, American Deposit Insurance Company and Government Employees Insurance Company.
No. 2003-CA-1052.
Court of Appeal of Louisiana, Fourth Circuit.
October 22, 2003.
*120 Jeffrey Perigoni, Law Office of Jeffrey Perigoni, Chalmette, LA, Counsel for Plaintiff/Appellee, Leo Misewicz.
Wayne R. Maldonado, Ginger K. DeForest, Ungarino & Eckert L.L.C., Metairie, LA, Counsel for Defendant/Appellant, American Deposit Insurance, Co.
Court composed of Chief Judge WILLIAM H. BYRNES, III, Judge MAX N. TOBIAS, JR., Judge LEON A. CANNIZZARO, JR.
LEON A. CANNIZZARO, JR., Judge.
This case involves an appeal by American Deposit Insurance Company ("American") from a judgment awarding the plaintiff, Leo Misewicz, damages in connection with an automobile accident. American is appealing the amount of damages awarded for lost wages and the assignment of all of the fault in the accident to its insured, Doreen Gamso.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
Mr. Misewicz was traveling eastbound in the left lane of Louisiana Highway 39, which is also known as East Judge Perez Drive ("Judge Perez"), in his Honda Accord (the "Accord"). He was approaching the intersection of Judge Perez and Tournefort Street when he saw a car, which was towing a trailer, cross the westbound lanes of traffic of Judge Perez and enter the median. When he saw that the trailer was blocking the innermost westbound lane of Judge Perez, Mr. Misewicz slowed down, because he was not sure whether the driver of the car in the median would wait for a break in the traffic to turn left or would pull out in front of him and make a left turn. Apparently, when *121 the driver of the car in the median saw Mr. Misewicz slow down, the driver accelerated and began to complete the left turn in front of Mr. Misewicz's Accord. Mr. Misewicz then stopped the Accord in the eastbound left lane of Judge Perez to avoid hitting the car as it completed the left turn in front of his Accord. When Mr. Misewicz stopped his Accord, a Ford Expedition (the "Expedition") driven by Ms. Gamso hit the Accord from the rear, causing damage to both vehicles.
The car towing the trailer continued to proceed down Judge Perez, and the driver was never identified. The first police officer to arrive at the scene of the accident was either a plain clothes officer or an off-duty officer, who was identified as a police officer by the badge that was hanging from his waist and the blue lights in his unmarked car. The officer told Mr. Misewicz and Ms. Gamso to move their vehicles out of the traffic lanes of Judge Perez, and the officer called a traffic accident investigator to the scene.
St. Bernard Parish Deputy Dick A. Beebe investigated the accident. The Accord and the Expedition had been moved out of the roadway, but Deputy Beebe did not note that there were any skid marks where the accident occurred. After speaking with both Mr. Misewicz and Ms. Gamso, Deputy Beebe issued a ticket to Ms. Gamso for following another vehicle too closely in violation of La. R.S. 32:81(A). She pled guilty to the offense.
Mr. Misewicz told Deputy Bebee that he was not injured. Two days after the accident, however, Mr. Misewicz awoke with a very painful neck, and he went to his family doctor, Dr. Andres G. Pedroza. Mr. Misewicz complained of pain and stiffness in his neck and headaches that occurred when he bent over or raised his arms above his head. Mr. Misewicz told Dr. Pedroza that he had been involved in a rear end collision in which he was wearing a seat belt and that his head had snapped forward when his car was hit from the rear. Dr. Pedroza examined Mr. Misewicz and determined that his headaches were secondary to acute muscle strain in his neck and back resulting from the automobile accident.
Dr. Pedroza referred Mr. Misewicz to Dr. Gary Carroll for x-rays. Dr. Carroll's report showed that Mr. Misewicz had physical evidence of acute muscular injury. After Dr. Pedroza received the radiologist's report, he prescribed physical therapy three times a week in addition to rest, hot compresses, muscle relaxants, and analgesics that he had already prescribed for Mr. Misewicz.
Because The Health Care Center of St. Bernard (the "Center") was more conveniently located than Dr. Pedroza's office, Mr. Misewicz stopped seeing Dr. Pedroza and began treatment with Dr. Janis A. Walder at the Center. Dr. Walder diagnosed Mr. Misewicz's condition as acute muscle strain, and she prescribed physical therapy as well as medication. Mr. Misewicz saw Dr. Walder on several occasions during his treatment. He then began to see Dr. Michael T. Howard, who also worked at the Center.
Dr. Howard thought that one of Mr. Misewicz's cervical disks might have been involved in his injuries, and he prescribed additional medication and continued physical therapy. Dr. Howard continued to treat Mr. Misewicz, and he ordered that an MRI be performed on Mr. Misewicz. The MRI showed some abnormalities including a minimal bulge of one of the disks in the spinal column in his neck.
Dr. Howard referred Mr. Misewicz to Dr. Salvador E. Murra for a neurological consultation. Dr. Murra performed a nerve conduction study that revealed a *122 chronic disk herniation on the left side of one of the bones in the spinal column in Mr. Misewicz's neck. Dr. Murra saw Mr. Misewicz for several months during which he added additional drugs and a soft cervical collar to Mr. Misewicz's treatment regimen.
When Mr. Misewicz returned to Dr. Howard, the doctor noted that Mr. Misewicz continued to have a reduction in motor strength. Dr. Howard also advised Mr. Misewicz that he could not help him improve any further, and he discharged Mr. Misewicz with instructions for him to return to Dr. Murra.
When Mr. Misewicz returned to Dr. Murra, he complained of tingling sensations in his neck and in the area above his left collar bone that radiated into his left shoulder. He also continued to suffer from headaches. Dr. Murra instructed Mr. Misewicz to continue taking the medications he had prescribed for him and to continue wearing the soft cervical collar. Approximately six months later, Mr. Misewicz again saw Dr. Murra, who advised Mr. Misewicz that he could return to work and that his condition would continue to improve.
Approximately three months after he was authorized to return to work, Mr. Misewicz found employment. Mr. Misewicz testified that he had been instructed not to return to work for an indeterminate amount of time by his doctors. The Center's records do not reflect that he was ever authorized to return to work, but he was permitted to return to school almost six months after the accident. A year and a half after the accident, Mr. Misewicz was allowed to return to work by Dr. Murra.
Prior to the accident Mr. Misewicz had been working full time as an air conditioning technician. He had just returned to school the week before the accident. He testified that he had arranged his class schedule so that he would not have any classes on Monday, Wednesday, and Friday so that he could continue to work three days a week.
Mr. Misewicz filed suit against Ms. Gamso and her insurer, American, and his uninsured motorist carrier, Government Employees Insurance Company ("GEICO"). GEICO was dismissed from the case prior to the trial. After a bench trial before the judge, the court rendered judgment against American and in favor of Mr. Misewicz in the amount of $49,941.63, and Ms. Gamso was dismissed from the case.
In giving reasons for judgment, the trial court stated that Ms. Gamso was at fault for striking the Accord in the rear with her Expedition. The court also found that Mr. Misewicz's Accord slowed and then stopped when the car, which was towing a trailer, pulled out from the median on Judge Perez in front of the Accord. The court further found that the only evidence offered by American and Ms. Gamso to show fault on the part of Mr. Misewicz was Ms. Gamso's testimony that Mr. Misewicz stopped abruptly to avoid a collision with the car that was emerging from the median. Ms. Gamso, however, testified that she, too, saw the car emerging from the median, and the court determined that what she saw should have alerted her to an impending stop by Mr. Misewicz. The trial court found that she breached her duty to maintain control of her Expedition so that she could avoid hitting the Accord.

LAW AND DISCUSSION

Lost Wages
American complains on appeal that the trial court erred in awarding lost wages in the amount of $20,592 to Mr. Misewicz. American alleges that Mr. Misewicz failed to prove that he was entitled to wages in that amount.
*123 In Boyette v. United Services Automobile Association, XXXX-XXXX (La.4/3/01), 783 So.2d 1276, the Louisiana Supreme Court discussed the law applicable to determining the amount of recovery for lost wages accruing prior to trial. The Supreme Court stated:
To recover for actual wage loss, a plaintiff must prove that he would have been earning wages but for the accident in question. In other words, it is the plaintiff's burden to prove past lost earnings and the length of time missed from work due to the accident.
XXXX-XXXX, p. 3, 783 So.2d at 1279 (citations omitted).
This Court has also considered the method for determining the amount of lost wages that accrue before trial. This Court has stated that "[i]n order to be entitled to an award for lost wages, a plaintiff must prove positively that he would have been earning the wages but for the accident in question." Falgout v. Louis-Jeune, 2000-2453, p. 10-11 (La.App. 4 Cir.10/3/01), 799 So.2d 610, 617. In Reichert v. Bertucci, 96-1213 (La.App. 4 Cir.12/4/96), 684 So.2d 1041, this Court stated that "[p]ast lost wages are susceptible of mathematical calculation, and the award is not subject to the much discretion rule." 96-1213, p. 5, 684 So.2d at 1044-45. See also Stark v. National Tea Co., 94-2633 (La.App. 4 Cir. 5/16/95), 655 So.2d 769.
On August 26, 2000, Mr. Misewicz sustained injuries when Ms. Gamso's Expedition hit the Accord he was driving. At trial Mr. Misewicz presented evidence in the form of three paycheck stubs for pay periods ending August 1, 2000, August 4, 2000, and August 12, 2000, showing that he worked 36.5 hours, 41.5 hours, and 45 hours, respectively, for each of three weeks.[1] Mr. Misewicz also introduced into evidence a copy of his Internal Revenue Service Form W-2 for year 2000, which showed that he earned $10,851.66 in gross wages that year.
American introduced into evidence an additional paycheck stub, which was for the period ending August 25, 2000, showing that Mr. Misewicz worked only six hours the first week that Mr. Misewicz attended classes at the University of New Orleans. Even though he had arranged his class schedule so that he would be able to work three days a week, the evidence shows that he did not do so the first week he attended school.
Mr. Misewicz contends that the number of hours he worked the week ending the day before the accident was an aberration, because that was his first week of school when he had to spend more time than usual attending to school matters. He further contends that he had scheduled his classes so that he could work 24 hours a week while he was attending school. American, however, argues that six hours per week is the basis upon which Mr. Misewicz's lost wages should be calculated.
In the instant case, we find that Mr. Misewicz sustained his burden of proof with respect to his lost wages and that the trial court did not err in its method of calculating the amount of damages awarded to Mr. Misewicz for lost earnings. The evidence produced at trial shows that he was working full time for $11.00 an hour prior to the accident except for the first week of school when he had nonrecurring school matters that reduced the time available for him to work that week. Mr. Misewicz had arranged his class schedule so that he would have no classes three full *124 days a week, and he testified that he intended to work full time those days. There was also evidence to support Mr. Misewicz's claim that he was unable to work due to injuries from the accident from September 2000, until March 2002, when his medical treatment was completed.
As required by the jurisprudence discussed above, the trial court calculated Mr. Misewicz's lost wages mathematically, based on his earnings of $11.00 per hour prior to the accident. The trial court also reduced the hours he would have been able to work had he not had the accident from his usual 40 hours to 24 hours, which is the amount of time that Mr. Misewicz planned to work while he was in school. The trial court then determined that there were 78 work weeks during the 18 months Mr. Misewicz was restricted from working by his physicians. Finally, the trial court awarded damages for lost wages in the amount of $20,592, which were calculated by multiplying $11 per hour by 24 hours a week by 78 weeks. We find that this assessment of damages was made by the trial court's mathematical calculations as required by the legal standards for the calculation of lost wages prior to trial.

Allocation of Fault
American argues that the trial court erred when it did not apportion any of the fault in the accident to the driver of the car that turned left from the median in front of Mr. Misewicz's Accord. American contends that under La. Civil Code art. 2323(A) Louisiana has a comparative fault system that requires some allocation of fault to be made to all parties at fault in an accident.
La. Civil Code art. 2323(A) provides as follows:
In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty ... or that the other person's identity is not known or reasonably ascertainable.
Each defendant in a lawsuit, who is at fault, is responsible for the fault allocated to that defendant.
Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985), is the seminal case in Louisiana on allocation of fault. In Watson the Louisiana Supreme Court set forth the following guidelines for determining the percentage of fault to be allocated among tortfeasors:
In assessing the nature of the conduct of the parties, various factors may influence the degree of fault assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the fault/negligent conduct and the harm to the plaintiff are considerations in determining the relative fault of the parties.
469 So.2d at 974. See also Joseph v. Broussard Rice Mill, Inc., XXXX-XXXX (La.10/30/00), 772 So.2d 94.
In Clement v. Frey, 95-1119 (La.1/16/96), 666 So.2d 607, the Louisiana Supreme Court stated that "the trier of fact is owed some deference in allocating fault, for the finding of percentages of *125 fault pursuant to the comparative fault article, La. Civ.Code art. 2323, is also a factual determination." 95-1119, p. 7, 666 So.2d at 610 (footnote omitted). See also Molina v. City of New Orleans, XXXX-XXXX (La.App. 4 Cir.10/2/02), 830 So.2d 994.
Applying the law applicable to the allocation of fault, we find that the trial court properly allocated all of the fault in the accident to Ms. Gamso. Ms. Gamso does not contest that she was at fault. American just wants some of the fault allocated to the unknown driver who turned left in front of Mr. Misewicz's Accord, causing Mr. Misewicz to stop the Accord abruptly in front of her Expedition.
In his Reasons for Judgment the trial court judge stated that the only evidence offered by Ms. Gamso to rebut the presumption of lack of fault on behalf of Mr. Misewicz was evidence that Mr. Misewicz stopped abruptly to avoid an accident with the vehicle that emerged from a median on Judge Perez and turned left in front of the Accord. The trial court found that both Ms. Gamso and Mr. Misewicz saw the vehicle emerge from the median. Therefore, Ms. Gamso, as well as Mr. Misewicz, should have been alerted to the fact that Mr. Misewicz would have to stop the Accord to avoid hitting the emerging vehicle. In turn, Ms. Gamso should have been alerted to the fact that she would have to stop the Expedition to avoid hitting the Accord. The trial court found that Ms. Gamso did not maintain the Expedition at a safe enough distance behind the Accord so that she could avoid hitting the Accord when Mr. Misewicz was forced to stop it in front of the Expedition. The trial court judge allocated all of the fault in this accident to Ms. Gamso on the basis of her failure to maintain a proper distance between her Expedition and the Accord. If she had not failed to do this, the accident could have been avoided. We defer to the trial court's findings of fact and his judgment on this matter.

CONCLUSION
Based on the foregoing, we find no error in the trial court's judgment. The judgment is affirmed.[2]
AFFIRMED.
NOTES
[1] The paycheck stubs cover three weeks of work, although they are not dated three weeks apart. Mr. Misewicz testified that his employer did not always pay him each week to explain why the dates on the paycheck stubs were not always a week apart.
[2] This opinion was approved by Chief Judge Byrnes prior to his death.